**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

**ARLISON L. HALL**                                            **PLAINTIFF**

**V.**                                            **NO. 4:16-CV-160-DMB-JMV**

**MUTUAL OF OMAHA INSURANCE COMPANY**                          **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

This Employee Retirement Income Security Act action is before the Court on Arlison Hall's motion for judgment on the administrative record, Doc. #33, and motion for attorney fees, Doc. #35; and Mutual of Omaha Insurance Company's motion for summary judgment, Doc. #38.

## I
## Procedural History

On July 11, 2016, Arlison Hall filed a complaint in the United States District Court for the Northern District of Mississippi against Mutual of Omaha Insurance Company asserting an Employee Retirement Income Security Act ("ERISA") claim for wrongful termination of disability benefits. The complaint seeks attorney's fees and a "judgment against the defendant for $2,624.50 per month for benefits from July 26, 2015 …." Doc. #1 at 12.

On June 1, 2017, Hall filed a motion for judgment on the administrative record, Doc. #33, and a motion for attorney's fees, Doc. #35. The same day, Mutual filed a motion for summary judgment. Doc. #38. Subsequently, this Court, on motions of the parties, extended the briefing periods for the pending motions and increased by ten pages the page limitation for briefs on the parties' dispositive cross-motions. Doc. #49.

Each party responded in opposition to the other's dispositive motion. Doc. #50; Doc. #54. Hall's memorandum in support of her response includes a request for oral argument on the

motions. Doc. #55. Mutual also responded in opposition to Hall's motion for attorney's fees. Doc. #53.

On August 31, 2017, Mutual replied in support of its summary judgment motion, Doc. #59, and Hall replied in support of her motion for attorney's fees, Doc. #57. Hall did not reply in support of her motion for judgment on the administrative record.

## II
## Request for Oral Argument

Local Rule 7(b)(6)(A) provides, in relevant part, that "[t]he court will decide motions without a hearing or oral argument unless otherwise ordered by the court on its own motion or, in its discretion, upon written request made by counsel in an easily discernible manner on the face of the motion or response." L.U. Civ. R. 7(b)(6)(A). In applying this rule, courts have considered whether the proposed oral argument would be either necessary or helpful to resolving the relevant motion. *See, e.g., St. Dominic-Jackson Mem'l Hosp. v. Sebelius*, No. 3:12-cv-832, 2014 WL 8515280, at *4 (S.D. Miss. Mar. 31, 2014) (denying oral argument because proposed argument neither necessary nor helpful); *Daimler Trucks N. Am. LLC v. McComb Diesel, Inc.*, No. 5:15-cv-30, 2016 WL 164615, at *4 (S.D. Miss. Jan. 13, 2016) (granting oral argument upon finding proposed argument would be helpful).

In seeking oral argument, Hall argues:

> [W]ith a 4100 plus page administrative record, oral argument would benefit the court and make the court's task easier and supply plaintiff with the opportunity to argue (brief) those parts of the defense's argument that page limitations hereof do not permit. More importantly, in a case of this nature, giving a plaintiff "her day in court" would seem more than appropriate.

Doc. #55 at 1 (emphasis omitted). Elsewhere in her memorandum brief, Hall specifies that the forty-five-page limitation prevented her from properly responding to the last six pages of Mutual's motion for summary judgment. *Id*. at 17.

First, while the administrative record is large, Hall has not shown how oral argument would make deciding the relevant motions easier.

Second, Hall's inability to respond to Mutual's arguments was a problem of her counsel's own making.   By order of the Court, "[t]he page limitation for the briefs on the cross-motions [was] increased by ten (10) pages."  Doc. #49 at 2.  The same order specifically provided that "[e]ach party's response … on the cross-motions may not exceed a total of forty-five (45) pages." *Id.*  Notwithstanding the clear language of this order, Hall, apparently believing that the twenty-six pages of the memorandum accompanying her own motion counted against the total pages of her response, ended her response brief after just nineteen pages.  While counsel's error is unfortunate, it does not justify oral argument.[1]

Finally, the Court does not believe that giving Hall "her day in court" renders an oral argument either necessary or helpful.  Accordingly, Hall's request for oral argument is denied.

### III
### Applicable Standard

As explained above, the parties have filed two different types of motions – Hall's motion for judgment on the administrative record, and Mutual's motion for summary judgment.  A "motion for judgment on the administrative record" is "a motion that does not appear to be authorized in the Federal Rules of Civil Procedure." *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003) (internal quotation marks omitted).  Thus, "[m]any courts have either explicitly or implicitly treated such motions … as motions for summary judgment under Rule 56." *Id.*  However, "it may be appropriate for the district court to treat such a motion as requesting essentially a bench trial on the papers with the District Court acting as the finder of fact. In that

---

[1] In reaching this conclusion, the Court notes that, in response to Hall's request for oral argument, Mutual pointed out that she had another twenty-nine pages to respond to its motion.  After being so informed, Hall made no attempt to supplement her response.

scenario, the district court may make factual findings, but it must be clear that the parties consent to a bench trial on the parties' submissions." *O'Hara v. Nat'l Union Fire Ins. Co. of Pitt.*, 642 F.3d 110, 116 (2d Cir. 2011) (internal quotation marks and citations omitted).

Here, Mutual has not consented to a bench trial on the parties' submissions. Rather, it asks this Court to treat Hall's motion as a motion for summary judgment. Under these circumstances, the Court interprets Hall's motion for judgment on the administrative record as one for summary judgment under Federal Rule of Civil Procedure 56.[2]

Under Rule 56 of the Federal Rules of Civil Procedure, "[s]ummary judgment is proper only when the record demonstrates that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Luv N' Care Ltd. v. Groupo Rimar*, 844 F.3d 442, 447 (5th Cir. 2016). "A factual issue is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party, and material if its resolution could affect the outcome of the action." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 226 (5th Cir. 2015) (internal quotation marks omitted). On a motion for summary judgment, a court must "consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Edwards v. Cont'l Cas. Co.*, 841 F.3d 360, 363 (5th Cir. 2016).

In seeking summary judgment, "[t]he moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (internal quotation marks and alterations omitted). If the moving party satisfies this burden, "the non-moving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories,

---

[2] To the extent Hall's response to Mutual's motion refers to the parties' "cross motions for summary judgment," this interpretation appears consistent with Hall's intent.

and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks omitted). "Where the nonmoving party bears the burden of proof at trial, the moving party satisfies this initial burden by demonstrating an absence of evidence to support the nonmoving party's case." *Celtic Marine Corp. v. James C. Justice Cos., Inc.*, 760 F.3d 477, 481 (5th Cir. 2014).

**IV**
**Factual Background**

**A. The Plaintiff**

Arlison L. Hall was born in 1965 and earned a bachelor's degree in communications from the University of Tennessee in 1989. AR:1404.[3] From January 1990 until December 1999, Hall held a variety of jobs, all in Washington, D.C. *Id.* In December 1999, Hall became Director of Communications for Share Our Strength, a non-profit organization based in Washington, D.C., dedicated to eliminating hunger in children. *Id.*; AR:4036.

**B. The Policy**

During the relevant time period, Share Our Strength maintained a Group Policy ("Policy") through Mutual. AR:0001. Under the terms of the Policy, Mutual was granted "the discretion and the final authority to construe and interpret the policy." AR:0007. Pursuant to this provision, Mutual maintained "the authority to decide all questions of eligibility and all questions regarding the amount and payment of any policy benefits within the terms of the policy as interpreted by Mutual." *Id.*

The Policy provided for the payment of long-term disability benefits if an insured became "totally or partially disabled due to injury or sickness." AR:0040. Of relevance here, such benefits

---

[3] Citations to "AR" refer to the administrative record, followed by a page number, such that "AR:0001" refers to the first page of the administrative record.

terminate on "the day [the insured] fail[s] to provide … satisfactory proof of continuous total or partial disability and/or any earnings." *Id*. With regard to disability, the Policy provided the following definitions:

> **Partial disability** and **partially disabled** means that because of injury or sickness you, while unable to perform the material and substantial duties of your regular occupation on a full-time basis, are:
>
>> (a) performing at least one of the material duties of your regular occupation or another gainful occupation on a part-time or full-time basis; and
>>
>> (b) currently earning between 20% and 80% of your Indexed Pre-Disability Earnings due to that same injury or sickness.
>
> The loss or restriction of a professional or occupational license for any reason does not, in itself, constitute Partial Disability.
>
> * * *
>
> **Total Disability and Totally Disabled** for other than pilots means that because of an injury or sickness:
>
>> (a) you are unable to perform all of the material duties of your regular occupation on a full-time basis; and
>>
>> (b) after a monthly benefit has been paid for 3 years, you are unable to perform all of the material duties of any gainful occupation for which you are reasonably fitted by training, education or experience.

AR:0023–24.

## C. October 2004 Accident and Initial Benefits Claim

On October 28, 2004, Hall was involved in an automobile collision during which she suffered injuries to her lower back and neck    AR:0398, 4032. In the months following the accident, Hall underwent two surgeries:  a lumbar decompression[4] on January 3, 2005, and a cervical decompression fusion on February 7, 2005. AR:4038. She did not return to work. *See*

---

[4] The decompression involved the removal of certain vertebrae at L5-S1. *See* AR:1151.

AR:4032.

On March 3, 2005, Hall submitted to Mutual a claim for long-term disability benefits. AR:4036–37. As part of her claim, Hall submitted a "Physician's Statement" prepared by Robert G. Squillante, M.D., an orthopedist. AR:4038–39. Squillante found that Hall suffered from cervical, lumbar, scapula, and shoulder pain, and that she was unable to lift, bend, twist, or reach overhead. *Id.* However, Squillante reported a "good" prognosis for recovery and noted that he expected "fundamental changes in [Hall's] medical condition" within one to three months. *Id.*

In support of Hall's application, Regina Cunningham, Share Our Strength's Human Resources Coordinator, completed a "Long Term Disability Claim Job Analysis." AR:4033–34. Cunningham reported that Hall's job required continuous sitting and occasional "Lifting/carrying" of an unspecified weight. AR:4033. However, Cunningham noted that the job could be performed by alternating sitting and standing and that a co-worker could assist with certain unspecified duties. AR:4034. Under the prompt, "What are the major tasks requiring use of one or both hands?," Cunningham wrote only "Typing occasionally." *Id.*

Mutual approved Hall's claim on March 28, 2005, with the approval retroactive to January 27, 2005. AR:4023–24.

### D. Continued Treatments

Following her surgeries, Hall was referred to Fredericksburg Orthopedic Associates "for aquatic progressing to land physical therapy." AR:1491 (emphases omitted). At Hall's initial appointment on April 4, 2005, a physical therapist prescribed an eight-week therapy regime involving two or three visits a week. AR:1492. Hall attended physical therapy at Fredericksburg Orthopedic Associates regularly from April until August 22, 2005. *See* AR:1491–1520. The notes from her final visit reflect "Improved tissue pliability." AR:1520.

While attending physical therapy, Hall saw at least two mental health professionals—Diana King, LCSW, and J. Daniel Byrne, M.D.—for post-traumatic stress disorder ("PTSD") related to the accident. AR:1545–46. King predicted that "it may take two or more years until [Hall] is able to return to pre-trauma functioning[,] which would include any form of employment." AR:1545. Byrne felt that Hall "may not be able to sustain gainful employment and [may] require disability benefits for up to 24 months." AR:1546.

In August or September of 2005, Hall moved to North Carolina. AR:1409. On March 22, 2006, Hall underwent a new patient evaluation at Blue Ridge Clinical Associates. AR:1526. Alan Spanos, M.D., the evaluating physician, observed restrictions in Hall's neck and lumbar movements. AR:1526–28. Spanos diagnosed Hall with (1) a "[d]iffuse pattern of neck, upper back and low back pain after high speed jolting injury and subsequent surgery;" (2) PTSD; (3) diabetes; and (4) depression. AR:1528. Spanos developed a treatment plan which stated:

> Because of financial predicament till insurance settlement, our only option is medication with low cost drugs till the settlement. We can then embark on a proper program of closely monitored PT using specific treatment modalities as 'therapeutic probes' to further investigate pain mechanisms and treatment options. She also needs and deserves ongoing psychological help for the PTSD, and also ongoing treatment for the overarching issue of her weight, diabetes and perhaps hypertension ….

*Id.*

Hall regularly visited Spanos for pain management. AR:1529–31. During that time, Spanos regularly prescribed Hall medications for anxiety and pain. *Id.*; AR:1563. After approximately a year of treating Hall, Spanos, in an April 5, 2007, letter to S-1 Group Disability Management Services, stated that Hall "is unemployable at present" but that he expected "her to

eventually be well enough to work, perhaps in 6 months to a year."[5]  AR:1553.

Also, in early 2007, Hall experienced a "recurrence of anxiety and related symptoms," which caused Spanos to refer Hall for treatment to Katherine Wu, M.D., a psychiatrist.  AR:1563.

### E.  Initial Evaluations

On February 4, 2008, Paul Kudowitz, M.D., completed a peer review of Hall's records. AR:1556.  In his review, Kudowitz expressed skepticism that Hall suffered from "true post-traumatic stress disorder" but stated, "I do believe that she does have a chronic pain syndrome." AR:1558.  Kudowitz concluded that while Hall had the potential "to perform an occupation that is sedentary in nature," her prescription regime (a mix of painkillers and anti-anxiety medications) precluded any such employment because it "could affect her ability to perform physically and cognitively."  *Id*.

About three weeks later, on February 27, 2008, a disability analyst for Mutual conducted an "Any Occupation Determination" for Hall.  AR:1555.  The document notes that Hall was taking Adderall, Zoloft, Lithium, Xanax, hydromorphone, hydrocodone, and metformin, and concludes:

> At present time ch is unable to work in any capacity due to the medications she is on and associated side effects. The medications are responsible for blunting cognitive capacity and the side effects from the medication may caus[e] her to have outbursts of anxiety and depression. Peer review of 2/4/08 concluded ch unable to work in any capacity at this time.

*Id*.

On July 24, 2008, Wu wrote a letter to Hall's counsel stating that Hall "will not ever be able to sustain regular employment."  AR:1559.  Wu based this conclusion on diagnoses of PTSD, depression, and chronic pain.  *Id*.

---

[5] Over two years later, on July 23, 2009, Spanos wrote Mutual, stating that "I am now much less confident that she will be able to return to full time, unrestricted work in the future."  AR:1554.  However, Spanos recommended that Hall's "impairment and disability should be reassessed about every 6 months."  *Id*.

## F. Social Security Award

On October 17, 2008, an Administrative Law Judge with the Social Security Administration issued a decision finding that Hall suffered from "the following severe impairment(s): post traumatic stress disorder; major depressive disorder; status post cervical fusion and lumbar diskectomy – chronic pain disorder of neck, upper back and shoulders[;] and diabetes mellitus …." AR:1594–97. The ALJ found Hall disabled from the date of her accident based on "[t]he severity of [her] Major Depressive Disorder and Post Traumatic Stress Disorder …." AR:1596.

## G. Initial Functional Evaluations

On October 13, 2009, Hall, at Mutual's direction, underwent an independent medical evaluation with William Lestini, MD. AR:3238, 3258. Based upon a physical examination and a review of Hall's medical records, Lestini concluded that "it would be reasonable for the patient to be able to do at least sedentary work with no lifting over 10 pounds occasionally. She should be allowed to change positions at the work site every hour for short periods." AR:3240. However, Lestini noted that this conclusion was "solely from an orthopedic perspective" and did not include "other issues such as pain and medication and stress-related disorders …." *Id.*

In the summer of 2010, Hall moved to Tennessee. *See* AR:3149. Before the move, Spanos referred Hall to Joanna Filchock, M.D., a physician in Farracut, Tennessee, for treatment. *Id.* In the referral letter, Spanos wrote:

> In a nutshell, this 45 year old lady was in a devastatingly severe auto accident in 2004, causing spinal injuries as well as post-traumatic stress disorder. By the time I saw her in 2006 she had had vertebral fusion surgery both in the neck and in the low back – for uncertain indications – but still had disablingly-severe low back and neck pain. After trials of the usual alternatives, it became clear that only a regimen of daily opioids would get her to be able to function well. She has been assiduous with an exercise program and various physical therapy approaches. A psychiatrist has helped with the PTSD and this is hardly a problem now.

*Id.*

On February 9, 2011, Filchock completed a functional evaluation for Hall. AR:3059. The evaluation states that Hall suffers from neck pain, paresthesia, and back pain. *Id.* Filchock found that Hall could not sit, stand, or walk, for more than one hour each in a given day. *Id.* Filchock further opined that Hall had reached maximum medical improvement and was restricted in her ability to lift and carry, bend, squat, crawl, climb, and reach above her shoulder. *Id.* Based on these findings, Filchock stated that she would not release Hall for vocational rehabilitation. *Id.*

On February 25, 2011, Mutual sent Filchock a letter accompanied by Lestini's report. AR:3040. The letter stated that "[b]ased on [Lestini's report], it appears Ms. Hall is able to perform the duties of her sedentary occupation as a Director of Communications." *Id.* Three days later, Filchock responded, "I do not agree[.] I think she is still disabled[.]"[6] AR:3041.

On May 19, 2011, Hall presented to Edward Kahn, M.D., for an independent medical examination. AR:3002. During the examination, Hall reported to Kahn that she was taking MS Contin, Percocet, Adderall, Metformin, Trazodone, and Prozac. AR:3004. Following the examination and subsequent review of Hall's medical records, Kahn diagnosed Hall with (1) "[c]hronic low back pain secondary to a degenerative L5-S1 disc and residual of lumbar strain from motor vehicle accident;" and (2) "[i]atrogenic instability C5-6 resulting in chronic neck pain." AR:3006. Kahn then opined:

> at this point, … her complaints of pain are consistent with her findings on examination and x-ray. Because of the amount of medication that she has to take to stay functional for her activities of daily living, I do not think that she would be a candidate to return to work at this point, even at a sedentary level. It is at least in my opinion that a surgical fusion at C5-6 may relieve enough of her pain to allow her to return to some level of employment but until that is done from my standpoint she is functionally impaired.

---

[6] For unknown reasons, it seems Mutual later sent Filchock an identical letter, to which Filchock responded, "I don't agree – again." AR:1727.

AR:3007.

On November 15, 2011, James Clark, a physical therapist, performed a functional capacity evaluation on Hall. AR:2864. Based on numerous physical tests, Clark found that "Hall demonstrated an ability to function in a Sedentary Physical Demand Level … for an 8 hour work day" and noted that "[t]he overall test results would not be considered to be her maximal performance due to … self test termination." *Id*.

Thomas Reeder, M.D., Senior Vice President and Medical Director for Mutual, sent Clark's evaluation to Kahn on December 1, 2011, along with a letter representing that, based on certain prescription records, "[i]t appears that Ms. Hall's statement to you concerning her medication use was inaccurate." AR:2837–38. In the same letter, Reeder stated that Hall had "completed a web design project," and started "power walking and walking her dogs." AR:2837. Based on these facts, Reeder concluded, "it appears … Hall has no objective functional deficits." AR:2838.

Kahn responded on January 13, 2012. AR:2834. In his response, Kahn stated that he was "reluctant to change [his] impression" because he was unfamiliar with the prescription database utilized by Reeder and because "Hall did not deny … that she was unable to walk around." *Id*.

One week later, on January 20, 2012, Mutual informed Hall that, based on Kahn's response, it would continue to pay long-term disability benefits. AR:2852.

### H. Continued Treatment

On September 5, 2012, Hall entered the care of Kelly Caldwell Chor, M.D. AR:2680–83. One month later, on October 5, 2012, Caldwell Chor completed a "Physical Capacities Checklist" for Hall. AR:2711–13. The report states that Hall could not sit for more than an hour during a day, and could not stand or walk for more than half an hour during the same period. AR:2711.

Caldwell Chor reached a similar conclusion on August 1, 2013.  AR:2593, 2646.

Throughout 2013 and into 2014, Hall presented to Tennova Comprehensive Pain Treatment Center Turkey Creek for pain medication management.  At these appointments, Hall regularly reported "moderate"[7] mental cloudiness related to her medications, as well as constipation and mild drowsiness.  *See* AR:0274, 0278, 0284, 0302, 0312, 0332, 0340.

In a June 9, 2014, evaluation, Caldwell Chor opined that Hall could (1) sit for only one or two hours in an eight-hour day; (2) stand for only one or two hours in an eight-hour day; (3) walk for only half an hour or an hour in an eight-hour day; (4) occasionally lift up to ten pounds but nothing more; (5) occasionally carry up to ten pounds but nothing more; (5) never push or pull items of any weight; (6) occasionally climb stairs, balance, reach forward, handle, and finger; and (7) never climb ladders, stoop, bend, kneel, crouch, or squat.[8]  AR:2594

## I.  Second Claim Review

On February 12, 2014, Mutual, as part of its ongoing review of Hall's claim, commissioned Palmer Vocational Services, LLC for an Occupational Analysis of Hall's former position.  AR:2631.  The report stated:

> Although there is no formal job description available, based upon consideration of the Claimant's report of his [sic] job related duties, and comparing this information to data available through a variety of vocational resources, it would be the opinion of this Consultant that the Claimant's job would compare to the occupation as defined in the DOT of Public Relations Representative[.]

*Id*.  The report further noted:

> The physical demand characteristics of this occupation generally fall within the sedentary exertion level, which is defined as exerting up to 10 lbs. of force occasionally and a negligible amount of force frequently to lift, carry, push or otherwise move objects. Sitting is required frequently to constantly with occasional or intermittent standing/walking. This category typically includes requirements for near visual acuity and repetitive, bilateral fine finger and hand movements.

---

[7] On at least two occasions, Hall reported the mental cloudiness as mild.  AR:0280, 0305.

[8] "Never" and "occasionally" are both checked beside crawl.

> As reported by OccuBrowse Plus, the physical demand characteristics [and] temperaments typically expected for this occupation are: having the frequent need to use upper extremities to reach, finger or handle objects; having the frequent need to talk to people or hear; and having the frequent need to perform activities requiring near acuity.

AR:2631–32.

On May 12, 2014, Mutual conducted a telephonic interview with Hall. AR:2608. During the interview, Hall stated that she (1) walks on a treadmill for about ten minutes at a time; (2) swims approximately three times per week; (3) attends movies but needs to stand up frequently; (4) is able to shop for her own groceries but requires assistance with heavy objects and bags; and (5) walks her dogs for approximately an hour, alternating sitting and walking. AR:2609. About six weeks later, on June 26, 2014, Mutual spoke again with Hall. AR:2505. During this conversation, Hall stated that she had recently been on vacation to Florida and that she went to the pool three or four times on the trip. *Id*. Hall further stated that the normal seven-hour drive to Florida required an extra four hours to accommodate her need to get out of the car and stretch. *Id*.

On September 29, 2014, Reeder conducted a second review of Hall's claim file. AR:4060–65. Reeder's report recited in detail Hall's medical record to date, including Kahn's observation that Hall was disabled due to her pain and side effects associated with her medication. Reeder also observed that from 2012 into 2014, Hall's "[s]ymptoms of fatigue and mental cloudiness rarely changed but the[] providers never recorded a physical exam, mental status exam, or assessment of activities in detail." AR:4064. Reeder noted that Hall's reported activity was "not consistent with [the] impairment claimed by her current providers," and recommended that Mutual "try to observe the Insured again, since she reports that she is active on a regular basis. If she is active, would then consider another [independent medical evaluation] with an orthopedic spine or neurosurgeon." AR:4065. Beyond asserting that Hall's prescription regime was inappropriate, Reeder offered no

opinion as to whether the associated side effects would result in disability, as Kahn claimed.

Consistent with Reeder's recommendation, Mutual scheduled Hall for an independent medical examination ("IME") on January 30, 2015, with Karpal Sidhu, M.D. AR:2205–2209. At the IME, Hall reported to Sidhu that she could not lift more than five pounds, that she could sit for only about ten minutes at a time, and that she could stand for only three minutes at a time. AR:2205. Sidhu conducted a physical examination which lasted approximately one hour and then spent five hours reviewing Hall's medical records. AR:2207. Based on the examination and review, Sidhu noted that "[n]o injury is going to occur if she does light work, but pain is the limiting factor." AR:2208. More specifically, Sidhu found "no real physical deficits" during his examination, and believed "[t]here may be some symptoms exaggeration because she says she cannot lift more than 5 lbs but can lift a gallon of milk which is about 8 lbs." AR:2207–08. Based on the uncertainty regarding Hall's pain, Sidhu recommended that Hall undergo a FCE. AR:2208.

On the day Hall was evaluated by Sidhu, she was, at Mutual's direction, under surveillance by Claims Bureau USA, Inc. AR:2248. During the surveillance, Hall was able to enter and exit her SUV, open and close the SUV's trunk by reaching up, carry "a tan purse," and carry fast food. AR:2249–51, 2255. Hall also rode in a car for more than an hour. AR:2251–52. On February 25, 2015, after reviewing both Sidhu's report and the surveillance summary, Reeder recommended that Hall undergo a FCE. AR:4056, 4058.

On April 2, 2015, Hall was evaluated during an FCE by Jennifer Galloway, a physical therapist. AR:2141–46. Galloway's notes reflect that, on the day of the test, Hall was on the following medications: Alprazolam .05 mlg, Benazepril 10 mg, Fluoxetine 40mg, Linzess 145 mg, Luvastatin 20 mg, Metformin 1000mg, morphine sulfur 60mg, oxycodone/ace, and tradazone 100 mg. AR:2143.

Following the examination, Galloway noted that Hall self-limited on 57% of the administered tests and that "[p]ossible causes of self-limiting behavior include: 1) Pain, 2) issues such as fear of reinjury, anxiety, depression and/or 3) Attempts to manipulate test results." AR:2141 (emphases omitted). Galloway wrote that "[i]f the self-limiting exceeds 20%, then psychological and/or motivational factors are affecting test results." *Id*. Galloway hypothesized that Hall's "[s]elf limiting behavior was due to [her] fear of re[in]jury, anxiety, and unawareness of safe physical maximum levels." *Id*. Ultimately, Galloway concluded that Hall's "[a]bilities as demonstrated fell into the lower end of the Sedentary level of work range," which Galloway defined as:

> Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exist up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exist from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

*Id*.

Approximately two weeks after Galloway completed the FCE, Reeder conducted another review of Hall's file. AR:4050. Based on Galloway's results, Reeder concluded that Hall suffered from no "functional deficits" and recommended that the FCE be forwarded to Sidhu for comment. AR:4053. Reeder submitted the FCE to Sidhu, who responded that Hall "needs a psychological evaluation to help determine why she is not putting the maximum effort during the FCE." AR:2126.

Consistent with Sidhu's recommendation, Mutual arranged for Hall to undergo an independent neuropsychological examination with D. Malcolm Spica, Ph.D. AR:2054. Spica performed a battery of tests on Hall on June 16, 2015, and issued his report one week later. *Id*. In

his report, Spica wrote that during the evaluation, "Hall exhibited pain behavior frequently throughout the examination, with particular complaints about weakness in her neck (requiring her to cup her chin in her hands with her elbows on the testing table)." AR:2059. Spica observed "probable symptom exaggeration" and found that "the findings do not support … restrictions or limitations on neurocognitive or behavioral health bases." AR:2060, 2062. However, he "defer[red] to appropriate medical resources to assess her reported orthopedic injuries/pain." AR:2062.

Hall was under surveillance by Claims Bureau USA on the date of her appointment with Spica and on June 18–20, 2015. AR:2020–21. The summary of the surveillance reflects that, on June 18, Hall drove herself to various locations, attended a movie for approximately three hours, and attended a dinner, during which she was able to sit for approximately one hour. During the surveillance, Hall regularly carried her purse. *See* AR:2020–28.

On June 26, 2015, an analyst with Mutual spoke with Hall regarding the testing performed by Spica. AR:2091. During the conversation, Hall stated that she struggled with pain during the examination and that she had to stay home the following day. *Id*. Hall stated she did not return to normal activities until June 22, 2015. *Id*.

On July 1, 2015, Reeder sent Caldwell Chor a letter detailing the results of the Sidhu and Spica examinations and the relevant surveillance. AR:2014–16. The letter also stated, "After review of all of this information, it can be concluded that Ms. Hall has no physical or psychological functional deficits." AR:2015. Reeder requested a response to the letter and noted that "if I do not hear from you within 10 days of the receipt of this information, I will assume that you are in agreement with the content of this letter." AR:2016. Caldwell Chor did not respond to the letter, or to two subsequent calls to her office. *See* AR:0087.

## J. Termination of Benefits

On July 30, 2015, Mutual sent Hall a letter stating, "we have determined that we are unable to approve benefits beyond July 26, 2015, and your claim for ongoing benefits has been denied." AR:1981. The letter noted that "[w]hile our review takes into consideration all of your available medical records, we place an emphasis on the most recent medical information available, as we have already reviewed your prior medical information and determined you were eligible to receive disability benefits." AR:1983. In this regard, the letter focused on medical evidence beginning with Caldwell Chor's June 9, 2014, analysis; Hall's statements to Mutual; and the surveillance of Hall. *See* AR:1981–1988.

The body of the letter begins by noting:

A Vocational Consultant reviewed your job description on February 14, 2014, and stated your occupation as a Director – Administrative, most closely correlates to The Dictionary of Occupational Titles' (DOT) definition of Public Relations Representative (DOT Code: 165.167-014/ SVP: 7).

Based on the Vocational Consultant's review of your job description, your occupation as a Director – Administrative is considered to be a sedentary occupation as it is performed in the national economy according to the DOT guidelines. Sedentary work involves exerting up to 10 pounds of force occasionally or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs may be defined as sedentary when walking and standing are required only occasionally and all other sedentary criteria are met.

AR:1983. Ultimately, the letter concluded:

the documentation does not support restrictions and/or limitations that would prevent you from performing the material duties of your regular occupation as a Director - Administrative. Therefore, no further benefits are payable and your claim has been denied as you do not satisfy your policy's definition of Total Disability and Totally Disabled, nor have you provided satisfactory proof of continuous disability as required by your policy. Therefore, no further benefits are payable and your claim for continued benefits have been denied.

The determination on your … claim was made independent of any other disability

determination, and based solely on the medical information in our file. It is noted that your Social Security Disability Application has been approved as of April 2005. However, we have in our possession documents that postdate the Social Security decision. Thus, we are not persuaded by the Social Security award.

AR:1988.

## K. Hall's Appeal

On September 25, 2015, Jack Scariano, Jr., M.D., performed an examination of Hall. AR:1742. Scariano found that "[a]t this time[, Hall] should avoid any type of occupation that involves persistent twisting and turning of her head and neck. She should also avoid any occupation that involves prolonged driving for long distances or great[er] than 1 hour."[9] AR:1743.

On December 30, 2015, Hall submitted to Mutual an appeal of the decision to terminate her benefits. AR:1402. Hall's appeal letter is rambling and somewhat difficult to follow. However, in one place, she contends that she is disabled due to her pain and need for bedrest. AR:1429. Elsewhere, she argues that her position was not sedentary, that Sidhu conducted a very limited examination of her, and that she did not self-limit during Galloway's evaluation because Galloway (rather than she) terminated the test because Galloway saw she was in pain.

The appeal letter, which was executed under oath by Hall, stated:

while the job titles might sound sedentary, the jobs involved much physical labor. An example of the physical activities claimant would have to do to perform her job would be when a superior would give a speech or presentation, the claimant would have to set up the stage, move stage furniture, sound equipment, microphones, etc. Claimant's activities may be well likened to those of a stage manager. On a number of occasions of each of these employments, claimant had sole responsibility for putting on conferences, some of them national. This involved setting up tables, distributing materials, preparing stages, supervising people as they entered the conference, as they co-mingled in the conference, etc. On many occasions, as a PR person, claimant would interact with other PR persons at various and sundry organizations which required her to carry gifts, documents and packets weighing some several pounds to these other PR persons, walking long distances in cities,

---

[9] Despite this restriction, Scariano's September 25 report noted a "Normal ROM of neck." AR:1743. On December 9, 2015, Scariano issued a supplement to his report which clarified that Hall's range of motion in her neck was "not normal." AR:1745.

such as New York. A portion of claimant's duties was working with non-governmental organizations such as food banks, and this is particularly true when she was with her last employer. This would require a walk through, an inspection of the food stuffs held in the food bank, and sometimes climbing on ladders and things of that nature.

AR:1405.

Additionally, Hall's appeal included approximately four hundred pages of materials, including a video recording of Sidhu's examination, older medical records,[10] and lay "under-oath, video-taped interviews" from Hall and associates of Hall. *See* AR:1404–1830. The appeal also included an affidavit from Brittany Cicele, Hall's housekeeper. AR:1437. The lay testimony states that Hall suffers from debilitating pain and is unable to perform numerous functions.

After receiving Hall's appeal, Mutual referred Hall's file to Elliot Ames, DO, an orthopedic surgeon. *See* AR:1147–54. Ames reviewed the relevant records, including the opinions of Scariano and Caldwell Chor and opined that while the medical evidence "would support that the claimant would be restricted from persistent twisting and turning of her head and neck," "[t]here would be no restrictions/limitations referable to fingering and handling." AR:1152–53. Ames also found that Hall "would … be restricted from climbing and bending" and stooping, kneeling, crouching, squatting, and crawling. AR:1153. He further noted that "[r]estrictions/limitations referable to lifting, carrying, pushing and pulling cannot be reliably determined from the records for the timeframe of 7/26/15 through 2/13/16." *Id.*

On March 10, 2016, Mutual issued a letter denying Hall's appeal. AR:1189. The letter stated that, based on the available information, "Hall would not be precluded from performing the duties of her own sedentary strength occupation." AR:1191. More specifically, the letter provided:

---

[10] On January 14, 2016, Hall supplemented her appeal with records from her 2005 cervical fusion. AR:1222.

It has been determined that Ms. Hall would not be precluded from performing the duties of her sedentary strength occupation. After reviewing all of the information in Ms. Hall's file, Dr. Ames determined that the limitations provided by Dr. Scariano indicating that Ms. Hall should avoid an occupation that requires persistent twisting and turning of her head and neck were acceptable. However, upon review of the occupational analysis, Ms. Hall's occupation as a Director of Communications typically requires her to have the frequent need to use her upper extremities to reach, finger and handle objects. She would need to have the ability to frequently talk to or hear people and frequently perform activities requiring near acuity. Therefore, she would not be precluded performing the duties of her own occupation. We are upholding the denial of the claim and no additional benefits are payable.

*Id.* The letter does not address the lay evidence submitted by Hall.

This action followed.

**V**
**Analysis**

As explained above, both parties seek judgment on Hall's ERISA claim that Mutual wrongfully terminated her long-term-disability benefits. To the extent the briefing for both motions address the same issue – whether Mutual abused its discretion – the Court will consider the relevant arguments together.

**A. ERISA**

In enacting ERISA, Congress sought:

to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

29 U.S.C. § 1001(b). To this end, "ERISA comprehensively regulates, among other things, employee welfare benefit plans that, 'through the purchase of insurance or otherwise,' provide medical, surgical, or hospital care, or benefits in the event of sickness, accident, disability, or death." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 44 (1987) (quoting 29 U.S.C. § 1002(1)).

Under ERISA, a participant or beneficiary in a regulated plan may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). "[D]istrict courts hearing complaints from disappointed ERISA plan members or their beneficiaries for the administrative denial of benefits are *not* sitting, as they usually are, as courts of first impression. Rather, they are serving in an appellate role." *McCorkle v. Metro. Life Ins. Co.*, 757 F.3d 452, 456 (5th Cir. 2014). In this role, a district court's review "is very narrowly restricted by ERISA and its regulations, as interpreted by the courts of appeals, and the Supreme Court …." *Id.* at 456–57.

"When, as here, the ERISA plan grants the administrator the discretion to interpret the meaning of the plan, [a court should] reverse an administrator's decision only for an abuse of discretion."[11] *Porter v. Lowe's Cos., Inc.'s Bus. Travel Acc. Ins. Plan*, 731 F.3d 360, 363 (5th Cir. 2013). "A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial." *Singletary v. United Parcel Serv., Inc.*, 828 F.3d 342, 347 (5th Cir. 2016). Thus, "[i]f the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail." *Killen v. Reliance Standard Life Ins. Co.*, 776 F.3d 303, 307 (5th Cir. 2015) (citation omitted).

"An ERISA claimant bears the burden to show that the administrator abused its discretion." *George v. Reliance Standard Life Ins. Co.*, 776 F.3d 349, 352 (5th Cir. 2015). "The burden of proof and the standard of review is the same whether the decision is an initial decision or a decision to terminate previously granted benefits." *Adams v. UNUM Life Ins Co. of Am.*, No. H-04-2179,

---

[11] As quoted above, the Policy granted Mutual "the authority to decide all questions of eligibility and all questions regarding the amount and payment of any policy benefits within the terms of the policy as interpreted by Mutual." AR:0007.

2005 WL 2030840, at *32 (S.D. Tex. Aug. 23, 2005) (citing *Ellis v. Liberty Life Assurance Co.*, 394 F.3d 262, 273 (5th Cir. 2004)); *see Braddock v. Baker Hughes Inc. Long Term Disability Plan*, 461 F.Supp.2d 490, 500 (S.D. Miss. 2006) ("Plaintiff has the burden of proving that Hartford's decision to terminate his long-term disability benefits constituted an abuse of discretion.").

The evaluation of an ERISA claim decision is ordinarily resolved in two steps. *Porter*, 731 F.3d at 364. First, the Court asks whether the decision was legally correct. *Id*. Second, the Court asks whether the administrator abused its discretion. *Id*. A court may, however, skip the first step if it "can determine the decision was not an abuse of discretion," *High v. E-Sys., Inc.*, 459 F.3d 573, 577 (5th Cir. 2006); or if "the case does not turn on sophisticated [p]lan interpretation issues," *Kolodzaike v. Occidental Chem. Corp.*, 88 F.Supp.2d 745, 748 (S.D. Tex. 2000). Because this case does not turn on sophisticated plan interpretation issues, the Court first reviews whether Mutual abused its discretion in terminating Hall's benefits.

"Abuse of discretion factors include: (1) the internal consistency of the plan under the administrator's interpretation, (2) any relevant regulations formulated by the appropriate administrative agencies, and (3) the factual background of the determination and any inferences of lack of good faith." *LifeCare Mgmt. Servs. LLC v. Ins. Mgmt. Arm'rs Inc.*, 703 F.3d 835, 841 (5th Cir. 2013) (citation and internal quotation marks omitted). In assessing abuse of discretion, a court should also consider whether the administrator had a conflict of interest.[12] *N. Cypress Med. Ctr. Operating Co., Ltd. v. Cigna Healthcare*, 781 F.3d 182, 196 (5th Cir. 2015). Here, the parties only address the factual background of the determination, and the existence of a conflict of interest.

---

[12] Hall argues that "there is a 'sliding scale' standard of review when the payor of benefits has the authority to determine the entitlement to such benefits." Doc. #55 at 2. While this was once true, the Fifth Circuit "no longer applies a sliding scale standard." *Burrell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 138 (5th Cir. 2016) (quotation marks and alterations omitted).

## B. Conflict of Interest

Where, as here, the claims administrator both evaluates and pays for claims, a court must consider the extent to which such conflict may have impacted the claims decision. *See Hagen v. Aetna Ins. Co.*, 808 F.3d 1022, 1027 (5th Cir. 2015). In this regard, "[c]ircumstances suggesting a higher likelihood that a plan administrator's conflict of interest affected their decision exist where the insurer has a history of biased claims administration or where the circumstances surrounding the determination suggest procedural unreasonableness." *Id.* The likelihood of impact "does not change the standard of review but affects … the amount of deference given under an abuse of discretion standard of review." *Id.* at 1028.

Hall does not argue that Mutual has a history of biased claims administration. Rather, she points to two indicia of procedural unreasonableness – Mutual's alleged failure to discuss her Social Security Benefits, and Mutual's reliance on the opinion of its employee, Reeder.[13]

### 1. Social security decision

"Failure to address a contrary SSA award can suggest 'procedural unreasonableness' in a plan administrator's decision." *Schexnayder v. Hartford Life & Acc. Ins. Co.*, 600 F.3d 465, 471 (5th Cir. 2010). However, an administrator is not required "to give any particular weight to the contrary findings." *Id.* at n.3. Indeed, it may "simply acknowledge[] the award and conclude[] that, based on the medical evidence before it, the evidence supporting denial was more credible." *Id.* Under this standard, it need not "explain[] why it departed from the SSA finding." *McFadden*

---

[13] Additionally, although not framed expressly as an argument about procedural unreasonableness, Hall takes issue with Mutual's letter to Caldwell Chor stating that failure to respond would result in Mutual assuming that Caldwell Chor agreed with its assessment that Hall was not disabled. Doc. #55 at 14. Hall contends this amounts to Mutual utilizing "some form of admission by silence." *Id.* This Court does not view the quoted language as evidence of procedural unreasonableness. At most, the language represents an attempt to encourage the treating physician to respond to the letter. Furthermore, while this Court is skeptical of the value of any opinion "assumed" by the failure to respond, it does not appear that Mutual interpreted Caldwell Chor's failure to respond as agreement, or relied on any such agreement in its determination.

*v. Prudential Ins. Co. of Am.*, 520 F. App'x 284, 288 (5th Cir. 2013).

In its denial letter, Mutual wrote that it was "not persuaded by the Social Security award" because it had in its "possession documents that postdate the Social Security decision." AR:1988. Although by no means detailed, this explanation was more than was required under the law and does not, therefore, suggest procedural unreasonableness.

### 2. Reliance on Reeder

This Court has not found a Fifth Circuit opinion addressing the propriety of an administrator relying on a medical opinion from an employee-physician. However, in the absence of "specific evidence of bias," an administrator does not abuse its discretion when it relies on reviewing physicians "employed by agencies that contract with" the administrator. *McDonald v. Hartford Life Group Ins. Co.*, 361 F. App'x 599, 609–10 (5th Cir. 2010). In reaching this conclusion, the Fifth Circuit relied on a Seventh Circuit opinion, which held that, standing alone, reliance on in-house employees did not alter the abuse of discretion standard. *Id*. (citing *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 575–76 (7th Cir. 2006)).

Given the Fifth Circuit's approval of the Seventh Circuit's conclusion, the Court follows the holding of *Davis* and concludes that reliance alone does not rise to the level of procedural unreasonableness. Accordingly, because Hall has pointed to no conflict other than Reeder's employment, reliance on Reeder's opinions does not justify imposition of a less deferential review.

### C. Factual Background of Determination

"With respect to the [factual background factor], to find an absence of abuse of discretion, this court must scour the record and the pleadings for any legal basis upon which the administrator could have based its interpretation." *Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d 337, 346 (5th Cir. 2002), *overruled on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115–19

(2008) (internal quotation marks and alterations omitted); *see Kennedy v. Elecs. Pension Plan, IBEW No. 995*, 954 F.2d 1116, 1124 (5th Cir. 1992) ("To find an absence of abuse of discretion, the court must scour the record and the pleadings for any legal basis upon which the Trustees could have based their interpretations.").

Mutual terminated Hall's benefits because it found she was capable of performing the material duties of her occupation. Mutual argues that its decision is supported by substantial evidence, including (1) Hall's conversations with Mutual; (2) the surveillance of Hall; and (3) the opinions of Reeder, Ames, Sidhu, Spica, and Galloway. Doc. #39 at 21. Mutual also contends that the lack of objective evidence of disability "alone constitutes substantial evidence." *Id.* at 22.

Hall's briefing (her motion for judgment on the record and her response to Mutual's motion for summary judgment) is somewhat difficult to follow. However, she appears to advance six primary arguments as to why Mutual abused its discretion—that Mutual wrongfully (1) concluded her activities (both reported and observed) do not support a claim of disability; (2) concluded her occupation was not sedentary; (3) concluded she could perform a sedentary position; (4) discounted her subjective complaints of pain; (5) did not credit the lay testimony offered by her friends and colleagues; and (6) relied on flawed medical opinions.[14]

### 1. Observed and reported activities

There is no dispute that surveillance of a claimant may support a finding of no disability. *Truitt v. Unum Life Ins. Co. of Am.*, 729 F.3d 497, 513–14 (5th Cir. 2013). However, surveillance videos will not support a finding of disability when they are "inconclusive, generally consistent with [the] claimed limitations, and [do] not adequately address [the claimant's] ability to perform the duties of her own occupation." *Bray v. Fort Dearborn Life Ins. Co.*, 312 F. App'x 714, 715–

---

[14] Hall also challenges the validity of Lestini's 2009 report, which was not relied on by Mutual in its termination decision.

16 (5th Cir. 2009).

Hall argues that her observed and reported activities do not support a finding of a disability because they are "very, very, human/animal activities" which do not show an ability to perform sedentary work. This Court agrees that Hall's surveillance activities (short walks, drives of various lengths, carrying a purse) would not, on their own, support a finding of no disability. However, Mutual did not consider Hall's activities to be direct evidence of non-disability. Rather, in its termination letter, Mutual cited Hall's activities for two purposes – establishing inconsistencies with Hall's own statements, and inconsistencies with the restrictions imposed by providers.

First, "inconsistent self-reported information" may support an administrator's denial of benefits. *See Giordano v. Providence Health Sys. in Wash.*, 747 F.Supp.2d 1137, 1143 (D. Alaska 2010). In this regard, Mutual found that "while you claimed to be bedridden after the neuropsychological evaluation, you were fully active for an extended period of time. This provides compelling evidence of your willful attempt to manipulate the results [of testing]." AR:1987. It appears Mutual based this conclusion on the apparent inconsistency between Hall's June 18 activities of driving, attending a movie, and attending a party, and her June 26, 2015, statement during a telephone interview that, following the examination, she did not return to "normal activities" until June 22. Mutual also found that "[d]irect observation revealed you were able to drive, sit for an extended period of time in a vehicle, and [are] able to walk[] for one half hour when you walked your dog. These activities greatly exceed what you had indicated you could do." AR:1985. While there is no record of direct observation of Hall walking her dogs for thirty minutes, she reported to Mutual that she walked her dogs for approximately an hour, alternating walking and sitting. Both this, and the observation of Hall riding in a car for approximately an hour, are inconsistent with Hall's reported statement to Sidhu that she could only sit for ten minutes

at a time, and stand for five minutes.  Accordingly, because Hall's activities were inconsistent with her self-reported information, Mutual did not abuse its discretion in considering this inconsistency in its disability determination.

Second, an administrator may also consider discrepancies between a claimant's observed activities and the limitations provided by the claimant's treating physicians.  *See Drinkard v. Hartford Life & Acc. Ins. Co.*, 2009 WL 198470, at *7 (N.D. Miss. Jan. 26, 2009) ("[T]o the extent Drinkard's treating physicians' limitations are not analogous to Drinkard's abilities as revealed by the surveillance videos, it was not an abuse of discretion for Hartford to rely on either [video].").  In this regard, Mutual noted that Hall admitted to traveling to Florida by car and that "the records consistently indicate over a period of several years, you swim regularly in a pool, walk on a treadmill, and walk your dogs almost every day. This is not consistent with impairment claimed by your current providers."  AR:1996.  It is unclear to which impairments and providers Mutual was referring.  Mutual has not explained, and this Court does not see, how swimming is inconsistent with any restriction imposed by a provider.  However, it seems likely that Mutual was referring to the opinion of Caldwell Chor that Hall could not sit for more than one or two hours and could not walk for more than one hour in an eight-hour day.  Such opinion would appear inconsistent with Hall's admission that she alternated sitting and standing for an eleven-hour period.  Accordingly, Mutual did not abuse its discretion in considering this inconsistency.

## 2.  Nature of Hall's "own occupation"

Under the Policy, a claimant who has received monthly benefits for more than three years is disabled if she is unable "to perform all of the material duties of [her] regular occupation on a full-time basis" and if she is unable "to perform all of the material duties of any gainful occupation for which [she] is reasonably fitted by training, education or experience."   AR:1875.

Hall contends that her job was not sedentary because it "required much physical activity." Doc. #55 at 6. Specifically, Hall submits that she was required to exert "much physical labor in setting up meetings, hauling or carting set-up material, packing and unpacking material for meetings, moving furniture, setting up stages and media centers, i.e., a stage manager or stage hand, putting together large sets, using hand tools." *Id*. Mutual argues that the phrase "regular occupation" refers to a broad class of occupations, not the specific job Hall held before her accident. Doc. #51 at 21–22. Mutual also contends that Hall's benefits could have been terminated because Hall did not meet the second prong of the disability definition – that she was unable to perform the material duties of *any* gainful occupation. Doc. #59 at 7.

As an initial matter, "courts reviewing an administrator's denial of benefits consider only the actual basis on which the administrator denied the claim, not its post-hoc rationalizations." *Koehler v. Aetna Health, Inc.*, 683 F.3d 182, 190 n.18 (5th Cir. 2012) (quotation marks and alterations omitted). Both the termination letter and the subsequent denial of appeal stated that Hall's benefits were being terminated because she was able to perform the duties of her occupation. The letters did not reference Hall's ability to perform another occupation. Accordingly, Mutual may not advance such an argument now. The question then becomes whether, under the Policy, Hall was able to perform the material duties of her "regular occupation."

There is no dispute that the term "own regular occupation" is not defined under the Policy. Based on the text of the denial letter, it appears Mutual defined the term as meaning Hall's "occupation as it is performed in the national economy." AR:1983.

Where, as here, certain terms are not defined under a governing plan, a court must "accord the terms their ordinary and generally accepted meaning." *House v. Am. United Life Ins. Co.*, 499 F.3d 443, 453 (5th Cir. 2007). To this end, "[a] number of courts have upheld an interpretation of

'regular occupation' as meaning a general occupation rather than a particular position with a particular employer." *Id*. at 453 & n.8 (collecting cases). Under this approach, the administrator must determine "the material duties of [the position] as they are found in the general economy." *Id*. at 454.

While the claimant's ability to perform her specific duties is not determinative of disability under this inquiry, the claimant's actual duties are relevant to the extent they "serve to illustrate the duties that [a person in the same position] at a comparable firm might perform." *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 396 (5th Cir. 2006). Where evidence of a claimant's actual duties has been introduced, the question becomes whether there is "evidence in the administrative record [which] suggests that [the actual] duties are atypical of" such a position in the general economy, *id*. at 396, or that the duties are otherwise not material to the position. Applying this approach to a "regular occupation" inquiry, courts have determined that "an insurer's exclusive reliance on the DOT [definitions] to define the material duties of a claimant's occupation may … be arbitrary and capricious if the plaintiff offers evidence that the job he was actually performing does not comport with the DOT description selected." *Rucker v. Life Ins. Co. of N. Am.*, No. 10-3308, 2012 WL 956507, at *9 (E.D. La. Mar. 20, 2012) (collecting cases).

Here, Mutual's vocational analyst, after considering Hall's duties, determined that Hall's job with Share Our Strength was most analogous to a Public Relations Representative, a sedentary occupation under both the DOT's occupational listing and a separate database known as OccuBrowse. Because Hall's description of her duties ostensibly conflicted with the database descriptions, reliance on these databases alone would be insufficient to establish the duties of Hall's "own occupation." *See Van Arsdel v. Liberty Life Assur. Co. of Boston*, 267 F.Supp.3d 538, 574 (E.D. Pa. 2017) (administrator's consideration of specific duties in considering analogous

occupation was not consideration of "the plaintiff's job description when determining how his 'occupation' is actually performed in the national economy"). However, as explained above, the duties listed by the databases are supported by the description of Hall's specific duties given to Mutual by Share Our Strength's Human Resources Director, Regina Cunningham, which contained none of the duties listed by Hall, and which represented that the only "major" task requiring one or both hands was typing.[15] Cunningham's description of duties, combined with the report of the vocational analysis, constitute substantial evidence that Hall's position was sedentary.

### 3. Ability to perform sedentary occupation

Hall contends that the opinion stated by Scariano, and accepted by Ames, that she is restricted from persistent twisting and turning her head, requires a finding that she is disabled from sedentary positions. However, Hall cites no authority, and this Court is aware of none, which stands for the proposition that an inability to persistently turn one's head is per se disabling. In the absence of such authority, Mutual was entitled to rely on the two vocational databases cited in its vocational expert's report, which did not include head turning as an essential duty, to conclude that Hall was able to perform her sedentary occupation.

### 4. Subjective complaints of pain

In her response to Mutual's motion for summary judgment, Hall, without discussion, quotes a number of cases for the proposition that "[n]ot only is there any prohibition against subjective symptoms, i.e. pain's being the basis of an ERISA claim, there are some 5th Circuit cases that hold pain, on a positive note, can be the basis of an ERISA claim." Doc. #55 at 7–8.

---

[15] While Cunningham's description of Hall's duties was not referenced in either the termination or appeal letter, it may still be considered for the purpose of determining whether Mutual's decision is supported by substantial evidence. *See Blake v. Metro Life Ins. Co.*, 415 F. App'x 571, 574 (5th Cir. 2011) ("Appellants argue that the letter denying benefits does not contain a sufficient rationale to support the denial. However, we review MetLife's determination based on the facts in the administrative record, which contains all information made available to the administrator.").

Although less than clear, it appears, from the context of the quotes, Hall argues that Mutual abused its discretion by discounting her subjective complaints of pain. Doc. #55 at 7–8.

"Plan administrators may not ignore consistent complaints of pain as subjective, but they are not required to give such complaints determinative weight." *Davis v. Aetna Life Ins. Co.*, 699 F. App'x 287, 296 (5th Cir. 2017). Furthermore, they do not "need to explain why they credited evidence that contradicts a claimant's reported limitations." *Id*. Thus, an administrator does not ignore complaints of pain when it mentions such complaints and then, without discussion, relies on medical opinions which contradict such claims. *See id*.

As described at length above, Mutual carefully considered Hall's subjective complaints regarding pain. After Sidhu noted that pain was Hall's primary limiting factor, Mutual referred Hall to Galloway, who opined that Hall may be unwilling to perform sedentary work due to "pain beliefs" but that her self-limiting behavior was not due to pain but to her "fear of re[in]jury, anxiety, and unawareness of safe physical maximum levels." Later, Mutual referred Hall to Spica, who observed that Hall engaged in "probable symptom exaggeration." In its termination letter, Mutual mentioned Hall's complaints of pain but ultimately relied on the opinions which found the pain not to be disabling. Mutual did not abuse its discretion in crediting these opinions over Hall's subjective complaints of pain.

### 5. Lay evidence

Hall also contends that Mutual erred in failing to credit the lay testimony. Doc. #55 at 16. Mutual argues that the videotaped statements lack credibility because they are biased and because the declarants lack medical training. Doc. #51 at 18. Mutual further asserts, "Hall does not cite to any case which has held that such lay opinions can be used to show that an administrator abused its discretion under ERISA." *Id*.

"Courts have consistently held that inadequate briefing results in a waiver of a party's argument." *TGIP, Inc. v. AT&T Corp.*, 512 F.Supp.2d 696, 712 (E.D. Tex. 2007). This Court agrees with Mutual that Hall's inadequate briefing of the issue of the weight, if any, to be accorded the videotapes (which does not cite specific evidence or authority) amounts to waiver of the issue.[16]

### 6. Reliance on medical opinions

In her response to Mutual's motion for summary judgment, Hall asserts objections to Mutual's reliance on the opinions of Reeder, Ames, Sidhu, and Spica.

#### a. *Reeder*

Hall argues that Mutual abused its discretion in relying on Reeder's opinions because Reeder was biased and because Reeder erred in determining that Hall's observed activities were inconsistent with her claimed limitations.

As explained above, reliance on an in-house physician's opinion is not procedurally unreasonable. Accordingly, an administrator does not abuse its discretion in relying on such opinions. *Davis*, 444 F.3d at 576 ("The singular fact of working in-house does not disqualify a doctor from rendering an independent opinion any more than does paying an outside doctor to do the same."). Furthermore, as also explained above, the Court concludes that some of Hall's observed activities were inconsistent with some of her claimed limitations.

#### b. *Spica*

Hall argues that Spica is a psychologist and that "inasmuch as claimant was not claiming

---

[16] While this Court has not found a Fifth Circuit case addressing the issue, a review of out-of-circuit authority suggests that, under certain circumstances, an administrator may be "obligated to consider [relevant] letters from family and friends attesting to [a claimant's] disorder. *Bloom v. Hartford Life & Acc. Ins. Co.*, 917 F.Supp.2d 1269, 1281 (S.D. Fla. 2013); *see Jahn-Derian v. Metro. Life Ins. Co.*, No. 13-7221, 2016 WL 1355625, at *10 (C.D. Cal. Mar. 31, 2016) (letters from colleagues "constitute competent evidence that must be considered in evaluating plaintiff's symptoms and how her pain affects her ability to work"); *Laurie v United of Omaha Life Ins. Co.*, No. 3:14-cv-1937, 2017 WL 975947, at *20 (D. Or. Jan. 23, 2017). Hall's inadequate briefing provides no bases for this Court to determine whether any of the foregoing cases would require consideration of the videotapes.

disability from psychological reasons," his report "is of no worth to this case." Doc. #55 at 12–13. Mutual responds that it was entitled to rely on Spica's report insofar as it relates to its conclusion that Hall was engaging in symptom magnification. Doc. #59 at 17–18.

The Court agrees with Mutual that Spica's conclusion was relevant to the extent it related to Hall's statement of mind during the relevant testing. *See generally Gonzalez v. Unum Life Ins. Co. of Am.*, No. 06-7024, 2008 WL 2949270, at *11–12 (N.D. Cal. 2008) (affirming denial of claim based, in part, on psychologist's conclusion of symptom magnification).

### c. Ames

Hall objects to the fact that Ames never treated or examined her. Doc. #55 at 17. While "the Fifth Circuit has rejected the notion that a plan administrator necessarily abuses its discretion by relying on the opinion of a consultant physician who has only reviewed a claimant's medical records[,] … numerous courts have recognized[] this fact may still be considered in assessing the overall reasonableness of the administrator's decision-making process." *Rucker*, 2012 WL 956507, at *19 (collecting cases). This Court has taken the fact that Ames did not conduct an examination into consideration in reviewing Mutual's ultimate conclusion regarding her disability.

### d. Reeder, Spica, Ames, and Sidhu generally

Hall points out that the reports of Ames, Spica, and Sidhu did not specifically opine that Hall was able to work. Relatedly, Hall cites a statement in one of Mutual's responses to a request for admission in which Mutual stated that Reeder does not make determinations "for long term disability benefits within the meaning of the policy." In essence, Hall seems to argue that the lack of an ultimate conclusion undermines the weight which should be afforded to these opinions. However, as explained above, termination of benefits is based on the record as a whole. Accordingly, a medical opinion need not affirmatively state that a claimant is able to work in order

to be considered by the administrator.

### D. Summary

As explained above, "[i]f the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail." *Killen*, 776 F.3d at 307 (citation omitted). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). So long as a decision is supported by substantial evidence, it does not matter whether the claimant "has supported his claim with substantial evidence, or even with a preponderance." *Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004). "A decision is arbitrary and capricious only if it is made without a rational connection between the known facts and the decision or between the found facts and the decision." *Truitt v. Unum Life Ins. Co. of Am.*, 729 F.3d 497, 508 (5th Cir. 2013) (internal quotation marks omitted).

Based on the discussion above, and upon consideration of the relevant factors and the parties' arguments, the Court concludes that Mutual's termination of Hall's benefits was supported by substantial evidence. Specifically, the Court finds that the vocational analysis, and the reports of Reeder, Sidhu, Ames, Galloway, and Spica, constitute substantial evidence that Hall can perform the material duties of her own occupation. While this conclusion conflicts with the restrictions imposed by Hall's treating physicians, "ERISA does not require the opinions of treating physicians to be preferred over those of other physicians reviewing a file; ERISA merely requires that the opinions of treating physicians, as with all evidence submitted by the claimant, actually be taken in account in an administrator's determination." *Love v. Dell, Inc.*, 551 F.3d 333, 337 (5th Cir. 2008). Thus, Mutual's decision to terminate Hall's benefits was not arbitrary and capricious and Mutual is entitled to summary judgment on Hall's claim. Accordingly, Hall's

motion for judgment on the record and motion for attorney's fees must both be denied.

## VI
## Conclusion

For the reasons above, Mutual's motion for summary judgment [38] is **GRANTED**.  Hall's motion for judgment on the administrative record, which this Court interpreted as a motion for summary judgment [33], and motion for attorney's fees [35] are **DENIED**.

**SO ORDERED**, this 22nd day of March, 2018.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**